UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| JONNELL SAUCEDA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:14-cv-04053-SLD-JEH |
| | ) | |
| CENTRAL POOL SUPPLY, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## ORDER

This is an employment discrimination case filed pursuant to 42 U.S.C. § 1981 and 775 ILCS 5/2-102 and 775 ILCS 5/6-101. Before the Court is Defendant Central Pool Supply's Motion to Dismiss, ECF No. 6. Central Pool Supply argues that Plaintiff Sauceda only pleads facts in his Complaint, ECF No. 1, sufficient to support the inference that he was discriminated against on the basis of his national origin, rather than his race, and that national origin cannot give rise to a claim under 42 U.S.C. § 1981. For the following reasons, the Motion to Dismiss is DENIED.

## BACKGROUND[1]

Jonnell Sauceda is half French and half Hispanic. ¶¶ 4, 9. On February 20, 2012, he began working as a driver for the Moline branch of Central Pool Supply, a swimming pool parts distributor with offices in Peoria, East Peoria, and Moline, Illinois. ¶¶ 4–5. In hiring for the position ultimately filled by Sauceda, Randall Gebhardt, who ran the Moline branch, told Mitchell George, the warehouse manager, "Do not hire any Mexicans or black people . . . [a]ll

---

[1] In a motion to dismiss, all well-pleaded allegations in the complaint are taken as true and viewed in the light most favorable to the plaintiff. *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 934 (7th Cir. 2012) (citation omitted). Accordingly, the material set forth here is, unless otherwise noted, based on allegations in the Complaint, ECF No. 1.

1

they do is steal from me." ¶ 7. Nevertheless, Mitchell later hired Sauceda, which upset Gebhardt. *Id.*

Over the course of Sauceda's employment at Central Pool Supply, Gebhardt made a number of statements that Sauceda construed as racially derogatory. These were:

- On September 16, 2012, Mexican Independence Day, Gebhardt sarcastically asked Sauceda if he would like to take the day off to celebrate. When Sauceda said that he would, Gebhardt refused to allow it. ¶ 9.

- Gebhardt asked Sauceda: "Don't all Mexicans drink tequila and ride borrows [sic]?"[2] *Id.*

- Gebhardt yelled on several occasions "All Mexicans are fucking stupid!" *Id.*

- Gebhardt told Sauceda that he was a "Frenchican," a joke whose humor came from Sauceda's mixed heritage. *Id.*

- On Cinco de Mayo, Gebhardt asked Sauceda where his sombrero was. *Id.*

- When Sauceda came in wet after having unloaded his truck in the rain, Gebhardt asked: "What's the matter Silver, aren't you used to getting wet?" Sauceda construed this as a joke about his Mexican racial identity whose humor came from the derogatory racist term "wetback." *Id.*

- When discussing then-Congressional candidate Cheri Bustos, Gebhardt said to Sauceda, "[I]f she wins there will be tacos for everyone." *Id.*

- Gebhardt referred in Sauceda's presence to President Obama as a "monkey" and "nigger." *Id.*

- Gebhardt told Sauceda to cut an African-American employee's hours because Gebhardt had "never had any luck with hiring niggers." *Id.*

---

[2] Presumably Gebhardt said or meant "burros," small donkeys.

- Apropos of another driver who called in sick, Gebhardt asked Sauceda: "Why don't you hire a fucking Mexican they will work until their fingers fall off?" *Id.*

- When Sauceda did not understand something Gebhardt had said, Gebhardt would suggest Sauceda might understand if Gebhardt repeated it in Spanish. *Id.*

- Gebhardt sometimes asked Sauceda if any of Sauceda's cousins were illegal immigrants. *Id.*

- Gebhardt liked to use the phrase "dirty Mexican" in Sauceda's presence, and to call Sauceda a Mexican. *Id.*

- When Hispanic customers came into the store Gebhardt would instruct Sauceda to tell them that Central Pool Supply did not accept pesos. *Id.*

When Sauceda complained to Gebhardt about the behavior, Gebhardt replied that he could do what he wanted. ¶ 10. Sauceda's complaints to another company official at the East Peoria branch were unavailing. ¶ 11.

On July 1, 2013, Sauceda called Central Pool Supply's main office to ask to take one of his accumulated sick days. ¶ 12. He was given permission. *Id.* When Sauceda called Gebhardt to inform him, however, Gebhardt fired Sauceda over the phone, citing "mistakes." *Id.* Two days later, the manager of Central Pool Supply texted Sauceda a picture of the inside wall of a portable toilet. ¶ 13; *see* Ex. A; ECF No. 1-1. Someone had written there: "viva la border patrol, alto Mexicano drogas – no mas illegals por hijos."[3] *Id.*

On June 9, 2014, Sauceda filed his Complaint with this Court. Central Pool Supply filed its Motion to Dismiss on July 16, 2014. Sauceda filed a Response on August 11, 2014. ECF No. 8.

---

[3] Sauceda translates this phrase: "[L]ong live the border patrol, stop Mexican drugs, nor [sic] more illegals." ¶ 13.

# DISCUSSION

## I. Legal Framework

In reviewing a motion to dismiss, a court must accept as true all well-pleaded facts in the complaint, and draw all reasonable inferences in favor of the plaintiff. *Scanlan v. Eisenberg*, 669 F.3d 838, 841 (7th Cir. 2012).

To survive a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss, a complaint "must actually suggest that the plaintiff has a right to relief." *Arnett v. Webster*, 658 F.3d 742, 752 (7th Cir. 2011) (quoting *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs.*, 536 F.3d 663, 668 (7th Cir. 2008)). To do so, the complaint must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Arnett* at 752 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In other words, the plaintiff's allegations must demonstrate that the claim "is plausible, rather than merely speculative." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1083 (7th Cir. 2008) (quoting *Lang v. TCF Nat'l Bank*, 249 Fed.Appx. 464, 466 (7th Cir. 2007)).

Section 1981 provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981. Section 1981 forbids racial discrimination in the creation of private as well as public contracts. *Campbell v. Forest Preserve Dist. of Cook Cnty., Ill.*, 752 F.3d 665, 668–69 (7th Cir. 2014); *Runyon v. McCrary*, 427 U.S. 160, 168 (1976). It does not create a cause of action for discrimination based purely on national origin. *Von Zuckerstein v. Argonne Nat'l*

*Lab.*, 984 F.2d 1467, 1472 (7th Cir. 1993); *Anooya v. Hilton Hotels Corp.*, 733 F.2d 48, 50 (7th Cir. 1984).

However, for the purposes of § 1981 actions, "the line between discrimination based on ancestry or ethnic characteristics, and discrimination based on place or nation of . . . origin is not a bright one." *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 614 (1987) (Brennan, J., concurring) (internal citations omitted) (ellipses in original). The statute is construed as extending broadly, rather than narrowly, to reach "at a minimum . . . discrimination directed against an individual because he or she is genetically part of an ethnically and physiognomically distinctive subgrouping of *homo sapiens*." *Saint Francis Coll.* at 607. However, a plaintiff need not prove that he himself is physiognomically distinct, but just that "he was subjected to intentional discrimination based on [his racial or ethnic status], rather than solely on the place or nation of his origin or his religion." *Id.* at 613. This is because § 1981 was "intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics." *Id.*

In making this determination, the question is not whether a particular group is viewed as racially or ethnically distinct today, but whether the class of people in question is of the kind that, at the time the legislation was enacted, Congress intended to protect.[4] *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617 (1987).

---

[4] In *Saint Francis College v.Al-Khazraji*, the Supreme Court was presented with the argument that under then supposedly modern racial categories, a complainant of Iraqi origin was a member of the "Caucasian" race, and thus could not have been discriminated against under § 1981 because he was "white." *Saint Francis Coll.* at 610. In rejecting this argument, the Court looked at nineteenth-century dictionaries, as well as the legislative debates surrounding the passage of the Civil Rights Act of 1866 and the Voting Rights Act of 1870, in which § 1981 had its genesis. *Id.* at 611–12. The Court determined that the concept of race embodied in the statute must have accorded with the notions expressed in these sources, which regarded "race" as a category almost compact with "ethnicity;" the Court pointed to discussion in the legislative debates of the "German," "Spanish," and "Gypsy" races, as well as "immigrant groups like the Chinese." *Id.* at 612–13. The ultimate conclusion, however, was not that these specific groups were or were not worthy of § 1981 protection, but that Congress intended to protect groups such as these from discrimination. *Id.*

Because of the muddy-at-best distinction between race or ethnicity and national origin, courts have followed the directive of *Saint Francis College* and exercised an expansive interpretation of § 1981 in many cases where a plaintiff pleaded what could have been construed narrowly as only a national origin. *See, e.g.*, *Doe on Behalf of Doe v. St. Joseph's Hosp. of Fort Wayne*, 788 F.2d 411, 418 (7th Cir. 1986) (finding that a Korean plaintiff had sufficiently alleged that she "belongs to a group that is distinct from 'white citizens' as a matter of race or color" because "[i]t is reasonably inferable from the claim that one is Korean that one is Oriental [sic]"), *overruled on other grounds by Alexander v. Rush N. Shore Med. Ctr.*, 101 F.3d 487 (7th Cir. 1996); *Bisciglia v. Kenosha Unified Sch. Dist. No. 1*, 45 F.3d 223, 229–30 (7th Cir. 1995) (finding that an Italian-American could have pleaded facts based on his heritage sufficient to show that he had been discriminated against within the meaning of § 1981); *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 756–57 (7th Cir. 2006) (finding that an Iranian-American plaintiff could allege discrimination on the basis of his racial identity as Iranian); *Daemi v. Church's Fried Chicken, Inc.*, 931 F.2d 1379, 1387 n.7 (10th Cir. 1991) ("The concept of race under § 1981 is broad. It extends to matters of ancestry which are normally associated with nationality, not race in a biological sense.").

In particular, claims of racism against ethnically Hispanic plaintiffs have been found to fall within the ambit of Section 1981, not only when a plaintiff pleaded that he was Hispanic, but also where plaintiffs merely pleaded that they were of a nationality often associated with Hispanic persons. *Padron v. Wal-Mart Stores, Inc.*, 783 F.Supp.2d 1042, 1053 (N.D. Ill. 2011). In *Padron*, the court discussed *Saint Francis College*'s extensive analysis of Congressional deliberation during the passage of § 1981. It noted that the Supreme Court had in that case found that "[d]ebates in Congress . . . referred to 'Spanish' and 'Latin' as a race." *Id.* (citing *Saint*

*Francis Coll.* at 612). The *Padron* court noted that Cuba was a former Spanish colony and found that this fact could support an inference that Congress understood Cubans and other members of former Spanish colonies as members of a "Spanish" race. *Id. See also Fonseca v. Sysco Food Services of Arizona, Inc.*, 374 F.3d 840, 850 (9th Cir. 2004) (recognizing a plaintiff who pleaded that he was of Hispanic race and Guatemalan ethnic identity as belonging to an "immigrant ethnic group" and, hence, a category protected by Section 1981).

However, it bears repeating that, at the motion to dismiss phase, all a plaintiff must do to state a claim under § 1981 is to allege "*some* facts from which it can be reasonably inferred that the plaintiff belongs to a group that is distinct from white citizens as a matter of race or color." *Anooya*, 733 F.2d at 50 (Cudahy, J., concurring) (internal quotation marks omitted) (emphasis in original).

## II. Analysis

Central Pool Supply claims that Sauceda only alleges that he is "half French and half Hispanic," and that because he does not describe his physical characteristics, he does not plead facts sufficient to support a § 1981 claim. Mot. Dismiss 2. Central Pool Supply further argues that, since the § 1981 claim should be dismissed, this Court should not exercise pendent jurisdiction over the accompanying state law claims. *Id.* 2–3.

However, it is not required that a plaintiff claim that he was physically distinguishable from "white" people, but merely that he belonged to an "identifiable [class] of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics." *Saint Francis Coll.*, 481 U.S. at 613. "[A] distinctive physiognomy is not essential to qualify for § 1981 protection." *Id.* Sauceda claims, and Central Pool Supply acknowledges, that he is of

7

French and "Hispanic" origin, and alleges that he was (mostly) discriminated against because of the latter.

Central Pool Supply appears to construe the word "Hispanic" to refer narrowly to a country of birth—essentially, as being synonymous with "Mexican."[5] However, "Hispanic" has a wider meaning:

> 1 : of or relating to the people, speech, or culture of Spain or of Spain and Portugal
>
> 2 : of, relating to, or being a person of Latin American descent living in the United States; *especially* : one of Cuban, Mexican, or Puerto Rican origin

"Hispanic," *Merriam-Webster.com*, http://www.merriam-webster.com/dictionary/hispanic (visited on Dec. 8, 2014). Therefore, on its face, the Complaint alleges that Sauceda belongs to a group that is far broader than nationality, a group "genetically part of an ethnically and physiognomically distinctive subgrouping of *homo sapiens*."[6] *Saint Francis Coll.*, 481 U.S. at 607. Without delving into the whatever contours or predicates may describe this group, the Court agrees with the Ninth Circuit's conclusion in *Fonseca v. Sysco Food Service of Arizona* that, at a minimum, Plaintiff's assertion of Hispanic identity is sufficient allegation of membership in an ethnically and physiognomically distinctive subgrouping to state a claim under § 1981. *See Fonseca*, 374 F.3d at 850.

Sauceda also alleges that he was discriminated against on the basis of his membership in this group, as he must to state a claim for § 1981 discrimination. *See St. Joseph's Hosp.*, 788 F.2d at 418. Sauceda states: "Throughout [his] employment, his supervisor . . . made the following racially derogative marks [sic] about Saceda's [sic] race," and lists the incidents described above. It would require a tone-deaf reading of Gebhardt's behavior as described to

---

[5] "[W]hat the Plaintiff is claiming is that he was discriminated against on the basis of his national origin." Mot. Dismiss 2.
[6] Sauceda identifies his mother as Mexican and his father as French. Compl. ¶ 9.

8

believe that it narrowly targeted only Sauceda's real or imagined Mexican nationality, and not also his broader Hispanic identity. Gebhardt allegedly mobilized a tiresomely familiar litany of stereotypes about people of Hispanic origin, including racial slurs ("wetback," "dirty Mexican"); caricatures involving sombreros, tacos, tequila, and burros; low intelligence; mindless industriousness; and illegal immigration. Compl. ¶ 9. Gebhardt also drew explicit comparisons between African-Americans, the paradigmatic group protected by § 1981, and "Mexicans," stereotyping both groups as thieves. Compl. ¶ 9. The Court rejects the argument that such behavior targeted Sauceda purely as a Mexican national, or child of one, and not also as a member of an "identifiable [class] of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics." *Saint Francis Coll.*, 481 U.S. at 613.

The Complaint thus states both explicitly and implicitly that Sauceda was a member of a group to which § 1981 applies, and was discriminated against on that basis. His Complaint states a claim upon which relief could be granted.

## CONCLUSION

Accordingly, Defendant Central Pool Supply's Motion to Dismiss, ECF No. 6, is DENIED.

Entered this 30th day of January, 2015.

s/ Sara Darrow _
SARA DARROW
UNITED STATES DISTRICT JUDGE
