UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| JONNELL SAUCEDA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:14-cv-04053-SLD-JEH |
| | ) | |
| CENTRAL POOL SUPPLY, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

ORDER

Before the Court are Defendant Central Pool and Supply's ("CPS") motion for summary judgment, ECF No. 21; Defendant's motion to strike portions of Plaintiff's response to that motion, ECF No. 28; and Plaintiff's motion for an order correcting his response, ECF No. 31. For the following reasons, the motion for summary judgment is DENIED. The other motions are MOOT.

**BACKGROUND[1]**

Plaintiff Sauceda's father is French, and his mother is Mexican, and Hispanic. Sauceda Dep. 90:3–23, Pl.'s Ex. 2, ECF No. 26-2. CPS is a swimming pool distribution and retail business in Moline, Illinois. CPS hired Sauceda as a driver on February 20, 2012. Since it is a pool company, CPS's business is seasonal. The company has only three full-time salaried employees: the district manager, the store manager, and the warehouse manager. Randy

---

[1] At summary judgment, a court "constru[es] the record in the light most favorable to the nonmovant and avoid[s] the temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). The facts related here are taken from the parties' undisputed material facts, Mot. Summ. J. 1–8, Resp. Mot. Summ. J. 2–5, from Sauceda's disputed material facts, Resp. Mot. Summ. J. 5–6, from Sauceda's additional material facts, Resp. Mot. Summ. J. 6–12, and from the exhibits to the motion and response. Where they are taken from elsewhere, or from specific exhibits to the parties' motions, the source is cited. Where the parties disagree about the facts, the Court views the evidence in the light most favorable to Sauceda, the non-moving party, and draws all reasonable inferences in his favor. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986)).

1

Gebhardt has been the district manager for CPS since 1988, and owns CPS with his brother. Greg Sommer is the store manager. Mitchell George was the warehouse manager at the time Sauceda was hired. George hired Sauceda, but Gebhardt ultimately made the hiring decisions. According to George, when George hired Sauceda, Gebhardt was upset when he discovered that Sauceda had Mexican heritage. George Aff. ¶ 8, ECF No. 26-1.

Sauceda's responsibilities as driver included delivering pool supplies to customers from the Moline store location. For the first few months after Sauceda was hired, George was his immediate supervisor. Eventually, Gebhardt fired George, Sauceda Dep. 23:9–11, and Bill Parker was hired as warehouse manager, *id.* at 23:4–8. Later, Gebhardt also fired Parker,[2] *id.* at 15–25, and Gebhardt promoted Sauceda to warehouse manager. The responsibilities of this position included ensuring that warehouse inventory was correct, that materials were delivered correctly, and the hiring and firing of warehouse workers. However, Sauceda still worked as a driver in tandem with his responsibilities as warehouse manager. *Id.* at 24:10–19. Sauceda also had to check all orders leaving the warehouse to ensure that they were correct. In the warehouse manager position, Gebhardt was Sauceda's immediate supervisor.

Although Sauceda and Gebhardt appear to have had a friendly relationship in some ways, with Gebhardt at one point lending Sauceda $700 for a plane ticket to go see his relatives, Sauceda describes it as rife with acts of racism by Gebhardt. The acts Sauceda attests to are listed below in no particular order.

- Gebhardt called Sauceda a "Frenchican," a term whose attempted humor came from Sauceda's mixed heritage.[3] Sauceda Dep. 57:13–19, 57:24–58:7.

---

[2] Sauceda claims Gebhardt said he fired Parker because Parker had "shit for brains." Sauceda Dep. 24:4–5.
[3] According to Sommer, this was a term coined by Sommer and Sauceda himself in a friendly context, and not first used, if at all, by Gebhardt. Sommer Dep. 12:21–13:14, ECF No. 26-4.

- Once Sauceda became warehouse manager, Gebhardt talked about Sauceda's ethnicity on "[a]lmost a daily basis," *id.* at 59:6, and "constantly," *id.* at 73:9. Gebhardt brought it up in such ways as telling Sauceda to tell Spanish-speaking customers, for whom Sauceda would translate, that the store didn't accept pesos, asking Sauceda in September 2012 if he would like the day off on Mexican Independence Day, and asking Sauceda if he "[rode] a burro and [drank] tequila like all Mexicans." *Id.* at 59:8–13.

- Gebhardt called Sauceda a "[s]tupid fuckin' Mexican" when something was not on a pallet for an order. *Id.* at 67:14. Sauceda said that Gebhardt did this "[y]ou know, just every time he had a chance." *Id.* at 67:15.

- He frequently referred to Sauceda as a "dirty Mexican." *Id.* at 99:22–100:5.

- Gebhardt asked Sauceda if he had any cousins or relatives who were in the United States illegally. *Id.* at 70:7–11.

- "During the preliminary stages of the hiring process . . . Gebhardt told [George] directly, 'Do not hire any Mexicans or black people. All they do is steal from me.'" George Aff. ¶ 6.

- Gebhardt told Sauceda to "hire a Mexican because they'll work until their fingers fall off, and everyone should own at least one or two." *Id.* at 70:21–24. Gebhardt also asked Sauceda "Do you know any Mexicans that do yardwork? I need my grass cut. Everybody should own one or two Mexicans, or a Mexican and a nigger." *Id.* at 73:21–23.

- When Congresswoman Cheri Bustos was running for congress, Gebhardt told Sauceda "[if] she wins, it'll be tacos for everyone." *Id.* at 73:12–13.

3

- At one point, Sauceda was unloading a truck while it was raining, and his back was wet. Gebhardt patted him on the back and said "you should be used to that." *Id.* at 74:20.

Sauceda construed this as a reference to the racist term "wetback." *Id.* at 74:21–23. Gebhardt vigorously denies that he ever used derogatory terms to describe Sauceda. Gebhardt Dep. 52:13–20. Pl.'s Ex. 3, ECF No. 26-3. Sauceda testified that, had he been able to afford it, he probably would have gotten therapy as a consequence of working at CPS. Sauceda Dep. 121:10–13.

The parties agree that Gebhardt had several complaints about Sauceda's performance. On a "weekly basis," *id.* at 45:7–8, the wrong equipment was delivered to customers, which Gebhardt regarded as ultimately being Sauceda's fault as warehouse manager. (In Sauceda's view, it was unreasonable to hold him responsible for all the bungled deliveries because he was still working as the only driver, *id.* at 47:23–48:2, and was often not at the warehouse to make sure orders went out correctly, *id.* at 48:11–24.) Gebhardt discussed these concerns with Sauceda. Gebhardt also felt that Sauceda was being lazy, "watching girls go into Walgreen's hanging around up front when he should be out back, keeping . . . workers busy . . . ." He also believed that Sauceda would go to a bar and drink alcohol on his lunch break. *Id.* at 56:2–5.

On June 31, 2013, Gebhardt told Sauceda that he was very unhappy with Sauceda's job performance, because Sauceda was not ensuring that orders were correct before they shipped. Gebhardt stated that on July 1, 2013, Sauceda told him he was not coming in to work because he needed to get a haircut. Gebhardt Dep. 41:14–21. Sauceda, however, stated that on this date, he called in to work to take a sick day, to which he was entitled. Sauceda Dep. 45:22–46:5. Sauceda then called Gebhardt separately, *id.* at 46:6–12, and Gebhardt told Sauceda that it was better if Sauceda and he "parted ways because of the mistakes," *id.* at 105:3–6, and that Sauceda

4

was fired. When Sauceda asked him why, he said "it's just not working out," *id.* at 46:16, and hung up. At some point during the termination call, according to Sauceda, Gebhardt also said that "he wasn't giving his benefits to a fuckin' Mexican." *Id.* at 22:19–24; 108:18–109:5.

Sauceda filed suit in this Court on June 9, 2014, alleging violation of 42 U.S.C. § 1981, Compl. 6–7, ECF No. 1, apparently both by alleging that his firing was discriminatory and that he was subjected to a hostile work environment; discrimination on the basis of race under Illinois law, 775 ILCS 5/2-102, Compl. 7; and retaliation for good-faith opposition to discrimination under Illinois law, 775 ILCS 5/6-101, Compl. 7–8.

## DISCUSSION

### I. Legal Standard on a Motion for Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial—that is, whether there is sufficient evidence favoring the non-moving party for a jury to return a verdict in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Patel v. Allstate Ins. Co.*, 105 F.3d 365, 370 (7th Cir. 1997). The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010) (citing *Anderson*, 477 U.S. at 255). "However, neither 'the mere existence of *some* alleged factual dispute between the parties,' nor the existence of 'some metaphysical doubt as to the material facts,' is sufficient to defeat a [properly supported] motion for summary judgment." *Hoffman v. MCA, Inc.*, 144 F.3d 1117, 1121 (7th Cir. 1998) (quoting *Anderson*, 477 U.S. at 247, and *Matsushita Elec. Indus. Co.*

*v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citations omitted). "A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole." *Pipitone v. United States*, 180 F.3d 859, 861 (7th Cir. 1999) (quoting *Roger v. Yellow Freight Sys., Inc.*, 21 F.3d 146, 149 (7th Cir. 1994)).

**II.     Analysis**

CPS argues that Sauceda's section 1981 claim must be dismissed because Sauceda cannot show sufficient evidence for a jury to find that he was terminated on the basis of race, Mot. Summ. J. 9–15; because he cannot make out a prima facie case that he was meeting his employer's legitimate job expectations under the indirect, *McDonnell Douglas* burden-shifting approach, *id.* at 15–18; and also cannot show that any similarly situated employees were treated differently, *id.* at 18–19. Even if he could, CPS argues that he could not meet the third step of the burden-shifting method by showing that its offered reason for his termination was pretextual, *id.* at 19–20. And insofar as Sauceda seeks to make out a hostile work environment claim under section 1981, CPS argues that he cannot show that his workplace was sufficiently objectively offensive, *id.* at 21–23. Finally, CPS argues that the Illinois state law claims rise and fall with the section 1981 claims, *id.* at 23–24. Sauceda responds in the most general terms, stating that counsel thinks summary judgment is used too frequently, Resp. Mot. Summ. J. 12–15, ECF No. 27, and asserts that there is a sufficient showing that race was the reason for Sauceda's termination to proceed to trial, *id.* at 15–17.

**a. Section 1981 Discrimination – Adverse Employment Action**

Section 1981, a Reconstruction-era civil rights law, protects the rights of "[a]ll persons within the jurisdiction of the United States . . . to make and enforce contracts . . . ." 42 U.S.C. § 1981(a). Section 1981 therefore prohibits discrimination in the making, conduct, or

termination of employment contracts on the basis of race, covering much the same ground, in terms of prohibited behavior, as Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e–2000e–17. *See CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 454–55 (2008). Courts generally evaluate section 1981 claims at summary judgment by the same standards of proof applied to claims brought under Title VII. *See Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 940 (7th Cir. 1996) ("Although section 1981 and Title VII differ in the types of discrimination they proscribe, the methods of proof and elements of the case are essentially identical."). Thus, a discrimination claim under section 1981 requires a plaintiff to show that "the basis for . . . [an adverse employment action] was the impermissible consideration of race, i.e., that a person of another race would not also have been [adversely affected] under similar circumstances." *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1112 (7th Cir. 1992).

"In a disparate treatment case such as this one, a plaintiff may prove discrimination either directly or indirectly. Under the 'direct method,' the plaintiff may avoid summary judgment by presenting sufficient evidence, either direct or circumstantial, that the employer's discriminatory animus motivated an adverse employment action." *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012) (citation omitted). If a party lacks sufficient evidence to make a direct showing of discriminatory animus, he may proceed "under the indirect burden-shifting approach outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Naficy v. Illinois Dep't of Human Servs.*, 697 F.3d 504, 509 (7th Cir. 2012). The Seventh Circuit has recently made clear that a "direct" case of intentional discrimination at summary judgment simply means a showing that, considered as a whole, "the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other

adverse employment action."[4] *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

As an initial matter, CPS correctly concedes that Sauceda's firing was an adverse employment action. *See Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). In addition a jury could find that he is a member of a protected class under section 1981. *See* Jan. 30, 2015 Order (denying CPS's motion to dismiss, which argued that Sauceda had not sufficiently alleged membership in a racial group to invoke the protection of section 1981), ECF No. 9. Furthermore, there is no disagreement that Gebhardt, as district manager and co-owner of CPS, was the person solely responsible for terminating Sauceda. The question must then be whether Gebhardt's behavior leading up to Sauceda's termination is sufficient to permit a jury's inference that the termination was impermissibly motivated by race.

The Court thinks that it is. Sauceda testified to severe and pervasive racism by Gebhardt on an "[a]lmost daily basis," Sauceda Dep. 59:6, over the entire course of his roughly year and a half of employment, and while Gebhardt contests that he made such statements, the Court resolves factual disagreements in Sauceda's favor in determining whether his claims should survive summary judgment. *See McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986)). While the Seventh Circuit has held that "stray [racist] remarks that are neither proximate nor related to the employment decision are insufficient to defeat summary judgment," *Garcia v. U.S. Postal Serv.*, 414 F. App'x 855, 857–58 (7th Cir. 2011) (quoting *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 781–82 (7th Cir.2007)), Gebhardt's remarks were not "stray," but, in Sauceda's telling, a daily occurrence. While the Seventh Circuit has often required "stray" racist comments to relate

---

[4] The point is that there is no difference in applicable legal standard between a court's consideration of direct and circumstantial evidence. *Ortiz* leaves in place burden-shifting frameworks like *McDonnell Douglas*. *Ortiz*, 834 F.3d at 766.

8

directly to an alleged adverse employment action, this case differs from many others, simply because of the pervasiveness and vituperativeness of Gebhardt's alleged behavior, and the fact that Gebhardt was not just a superior, but the co-owner of the company and the ultimate arbiter of all hiring and firing. *Cf. Eiland v. Trinity Hosp.*, 150 F.3d 747, 750–51 (7th Cir. 1998) (holding that stray racist comments, made over time by a nondecisionmaker, were not probative of prohibited animus in termination).

Not only were the comments allegedly frequent, but they often, as reported, had to do with Sauceda's ability to do his job, making the comments more probative of race-based termination than they would otherwise be. The comments seem often to have come as a direct result of a failure to do his job up to Gebhardt's standard, as when Gebhardt allegedly called him a "stupid fuckin' Mexican" when some object was not where it was supposed to be. Sauceda Dep. 67:14. Most importantly, though, Sauceda stated more than once at his deposition that Gebhardt said he fired Sauceda because Gebhardt "wasn't giving his benefits to a fuckin' Mexican." *Id.* at 22:19–24, 108:18–109:5. If a jury credited Sauceda's testimony on this score, it could conclude on that basis alone that Gebhardt had terminated Sauceda because of race.[5]

The authority that CPS cites in support of its motion for summary judgment on the termination claim is inapposite because those cases deals with scattered or isolated comments, none of which directly relate to an employer's decision to terminate employees in general or a plaintiff in particular. *See Stopka v. All. of Am. Insurers*, 141 F.3d 681, 688 (7th Cir. 1998) (holding that district court properly excluded as irrelevant sexist remarks made by defendant corporation's general counsel one night at a dinner party); *Geier v. Medtronic, Inc.*, 99 F.3d 238,

---

[5] In addition, in Sauceda's version of the firing, Gebhardt had almost no reason to fire him—the precipitating cause was that Sauceda took permitted sick leave. A jury could conclude that a race-based reason supplies the otherwise lacking basis for terminating Sauceda (assuming, of course, that the jury sided with Sauceda in his contention that Sauceda was not responsible for errors in delivery of CPS products).

9

242 (7th Cir. 1996) (holding that supervisor's single sexist comment made a year before adverse employment action was not probative of animus).

Because Sauceda's version of events differs so drastically from Gebhardt's (and, to a lesser extent, Sommer's), the question of liability turns heavily on credibility determinations that only a factfinder can make. Because a jury could infer, from all the evidence in the record, that Gebhardt fired Sauceda because of race, summary judgment is not warranted on Sauceda's section 1981 claim for discrimination in terminating him.

### b. Section 1981 Discrimination – Hostile Work Environment

"In order to create a hostile work environment, the conduct at issue must 'ha[ve] the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.'" *Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526, 533 (7th Cir. 1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)). For such claims to be actionable, workplace harassment "must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor*, 477 U.S. at 67 (quoting *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982)). Thus, to show a section 1981 hostile work environment claim, harassment must be "(1) based on race; (2) subjectively and objectively hostile; and (3) sufficiently severe or pervasive to interfere with an employee's ability to perform his assigned duties." *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 271 (7th Cir. 2004). "The requirement of subjectivity is intended to ensure that the plaintiff did actually feel harassed, because 'if the victim does not subjectively regard the environment as abusive, the conduct has not actually altered the victim's employment and there is accordingly no [section 1981] violation.'" *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 693 (7th Cir. 2001) (quoting *McKenzie v. Illinois Dep't of Transp.*, 92 F.3d

10

473, 479 (7th Cir. 1996)). "An objectively hostile work environment is one that a reasonable person would find hostile or abusive." *Haugerud*, 259 F.3d at 693. In determining whether a workplace was objectively hostile, a court must consider all of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

First, a jury could conclude that all of Gebhardt's statements that Sauceda points to as racially discriminatory were racially discriminatory. The court rejected CPS's argument at the motion to dismiss phase that there was a meaningful distinction, for purposes of section 1981 jurisdiction, between slurs based on Mexican nationality and Hispanic racial or ethnic identity. Jan. 30 2015 Order 6–7. Whether slurs like "dirty Mexican" simply are racist, or proxy for it in contemporary America, a reasonable jury could certainly construe such comments as being based on race.

Second, there is no question that a jury could find Sauceda subjectively regarded the work environment as abusive. He complained to multiple other people about Gebhardt's behavior, Sauceda Dep. 20:8–9, 84:15–17, 43:15–44:12, and stated that if he had been able to afford therapy after being terminated, he probably would have, *id.* at 121:10–13. So too, a jury could find that a reasonable person would find CPS a hostile and abusive workplace. Sauceda testified that he was harassed for his ethnicity on a daily basis by his immediate supervisor, who also owned and ran the business and made all the hiring and firing decisions. While there is no suggestion that Gebhardt's behavior ever verged into violence, the comments Sauceda describes, if true, are luridly unpleasant and demeaning. In addition, Sauceda stated Gebhardt leveraged his power as employer to intimidate Sauceda and other employees, relying on their need for

employment to manipulate them. *See* Sauceda Dep. 75:8–14 ("[Gebhardt] would look at me and approach me with, you know, a chip on his shoulder. Like if you don't like it, I can make or break you.").

By the same token, a jury could find that Gebhardt's behavior, as described by Sauceda, was sufficiently severe or pervasive to interfere with Sauceda's assigned duties. CPS mischaracterizes the record when it argues that Sauceda described "a handful of actual racial statements." Mot. Summ. J. 22. Sauceda testified that the comments were made on "[a]lmost a daily basis," Sauceda Dep. 59:6, and "constantly," *id*. at 79. He said that Gebhardt would call him a "[s]tupid fuckin' Mexican," *id.* at 67:14, "every time he had a chance," *id.* at 67:15. Sauceda describes a daily drone of aggressive racism, punctuated by especially picturesque episodes that stuck out. A jury could find that this was not a "handful" but a multitude, and that it made Sauceda's job difficult to do.[6] *Cf. Schwapp v. Town of Avon*, 118 F.3d 106, 110–11 (2d Cir. 1997) ("Thus, whether racial slurs constitute a hostile work environment typically depends upon 'the quantity, frequency, and severity' of those slurs, considered 'cumulatively in order to obtain a realistic view of the work environment.'") (quoting *Vore v. Indiana Bell Tel. Co.*, 32 F.3d 1161, 1164 (7th Cir.1994) and *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 444 (7th Cir. 1994)).

Summary judgment on Sauceda's hostile work environment claim is not warranted.

c. **State Law Discrimination Claims**

The Illinois Human Rights Act ("IHRA") makes it illegal "[f]or any employer . . . to act with respect to . . . privileges or conditions of employment on the basis of unlawful discrimination or citizenship status." 775 ILCS 5/2–102(A). It also forbids retaliation "against a

---

[6] CPS argues that this evidence would be inadmissible, under Federal Rule of Evidence 404(b), to show that Gebhardt terminated Sauceda for impermissible reasons. However, evidence of alleged workplace harassment would be admissible at least for the purpose of making out Sauceda's hostile work environment claim.

12

person because he or she has opposed that which he or she reasonably and in good faith believes to be unlawful discrimination . . . ." *Id.* 5/6-101. An IHRA plaintiff shows discrimination by the same method as a Title VII or section 1981 claim. *Zaderaka v. Ill. Human Rights Com'n*, 545 N.E.2d 684, 687 (Ill. 1989); *see Rabe v. United Air Lines, Inc.*, 971 F. Supp. 2d 807, 811 (N.D. Ill. 2013) (evaluating IHRA discrimination and retaliation claims under the Title VII framework). Since Sauceda's section 1981 claims for discrimination survive summary judgment, his IHRA claim does too. CPS does not address the retaliation claim in its motion for summary judgment. Dismissal of neither IHRA claim is warranted.

## CONCLUSION

Accordingly, Defendant's motion for summary judgment, ECF No. 21, is DENIED, and the other motions, ECF Nos. 28, 31, are MOOT. Since the Court previously vacated the final pretrial conference and jury trial dates in this case, they are reset as follows: the final pretrial conference is set for July 12, 2017 at 1:30 p.m., at the Rock Island Courthouse. Counsel who will actually try the case are to be present. The jury trial is set for 9:00 a.m. on August 21, 2017, also at the Rock Island Courthouse. The parties should submit a proposed final pretrial order by July 5, 2017 that shall conform in form and content to the requirements of Local Rule 16.1(F). Witness lists shall be redacted and an unredacted list shall be filed separately using the event "Witness List." Jury Instructions shall be e-filed separately in three separately-numbered parts: Agreed Instructions, Plaintiff's Instructions (to which Defendant objects), and Defendant's instructions (to which Plaintiff objects).

Entered this 30th day of March, 2017.

s/ Sara Darrow
SARA DARROW
UNITED STATES DISTRICT JUDGE
